v. Smith & Nephew, Inc. Our second case today is appeal number 2014-1822 and 1823. This is ConvaTec Technologies, Inc. v. Smith & Nephew, Inc. I'd like to address two issues in this case. One is the plain construction issue and then the amendment practice. In Microsoft v. Proxicon, this court reaffirmed that the Broadest Reasonable Interpretation standard requires taking the specification into account. ConvaTec was prejudiced in this case precisely because the Board failed to do so. We're contesting two limitations, the incorporating silver limitation. ConvaTec pointed out that that required loading. Smith argued and the Board accepted that incorporation is a generic concept and loading is just a species. The Board erred there. If you meant loading, why didn't you use the word loading in the claims? The claims, well, the specification uses it as a synonym, so it didn't matter which word was used. Well, I mean, that sounds kind of contrary to our normal practice of not reading specific embodiments of the specification into broader claim language. I agree, Your Honor, and that is not at all what ConvaTec is asking the court to do. The reason I'm saying that there's no substantial evidence in the specification is because it's literally true. There's no substantial evidence for a broader reading. In fact, the grammar of the specification requires you to read loading and incorporation as synonyms. Loading means some kind of ionic exchange between the silver and the polymer, right? Precisely, Your Honor. And can an unmodified polysaccharide have that kind of ionic exchange with the silver? Nobody is saying that it would, but if you read the— But then the claim language actually talks about, includes a polysaccharide having the silver incorporated in it, right? It does, Your Honor, but it doesn't— So then why would we be compelled to read incorporate to mean something that can't fit or can't be done by the recited polysaccharide in the claim? Well, allow me two responses to that. First of all, again, because the specification uses them as synonyms, if there's a problem, it's a different problem if the claim is inconsistent. But in fact, the claim language is not inconsistent because it gives a group of fibers that can be used individually or in mixtures, but it gives further guidance that restricts the choice within that. You don't think we can read the claim and then the rest of the structure of the specification together to try to understand what's the best understanding of what the inventor contemplated when it talked about using a polysaccharide, unmodified polysaccharide as the polymer? I am not asking this Court to read anything out of the claims or out of the invention. In fact, quite to the contrary, but it's well established in this Court's precedent that you have to read the claim as a whole. I believe N. Ray Cook, for instance, talks about if there are inoperative embodiments, but it would be clear what those would be from the language of the claim itself. You can't pick something that would be inoperative by ignoring the other limitations. Cook was a very broad generic claim, right? Here, your claim is specifically reciting and declaring to the world that one of the embodiments is a polymer that consists of a polysaccharide. And so this looks to me like it's different from Cook. Well, it's not a generic claim, it's true, but it's a group that you can choose from either individually or in combination, but any choice you make from that has to comply with the incorporation, which the specification tells you means loading, and it also has to be photocycled. So there are other limitations that guide whatever choices you would make there. An analogy might be if I told you that you could pick any fruit you wanted as long as it was orange. If you're looking at a table and there are bananas there, they're probably not orange. You can't choose that. You know that that's not an acceptable choice. So I guess you're expecting us to read the claim that the inventor drafted and ignore the term polysaccharide so that we can understand the word incorporate in the claim to mean something much more specific, i.e. loading, i.e. ionic exchange. The specification gives us no choice. Is that fair to say, that that's the argument? I don't think so, Your Honor, because the specification gives you no choice. There's no grammatical sense in the specification except to read loading as incorporate. So then the question is, what do you do with the fact that there are non-ionic fibers listed in the claim? Well, the answer is you can use those in combination with the ionic fibers, or at least in some of the claims, those fibers, there's nothing that restricts them from being modified. It says consisting of, though. I mean, what does consisting of mean when it says consisting of polysaccharide? Doesn't that contemplate that it is polysaccharide, period, as the fiber, the polymer? You wouldn't choose just polysaccharide alone, because read in context with the rest of the claim, that would be an illegitimate choice. But consisting of polysaccharide with a mixture of other fibers, it's very easy to come up with compliant examples. I'm going to run short of time, though, if I can't move on to the other one. Okay. Okay. The other limitation we are contesting is the substantially protostable when dry. Again, if you read the specification, you can hear what's going on. The specification tells us that the use of silver in these materials is old, that a known problem with that is uncontrolled discoloration. In the very next sentence, it explains that the solution is to make a protostable material. So the solution to uncontrolled discoloration is a protostable material. It explains the prior solution, trying to do that in a prior order, were unsatisfactory. The specification then goes on to define protostable as allowing controlled color change to a desired color and the minimal change thereafter. It's important to read that minimal change in light of how protostable has been described earlier, which is that it is a solution to discoloration. So whatever minimal color change thereafter means, it can't mean discoloration. Well, the language here is, it's a little confusing to me, maybe even a little tricky. I don't know what it means when it says controlled color change to a desired color. To me, just that opening phrase suggests you start with a color A and now you change in some controlled way to a color B, where color B is a desired color. Right, but that makes perfect sense in the context. So the color starts off as what? White? In the examples in the prior art that I'd like to get to, yes, that's exactly what happens. So now it's got to change to a desired color to be photostable. What would that desired color be? It doesn't matter, Your Honor. Any color, as long as it's not this color. Okay, but... The point of this... Would purple be? Purple would be absolutely fine. So it can change from, you're telling me it can change from white to purple, because that would be a controlled color change to a desired color. It has to be a controlled change to that desired color, and once you get that desired color, it can't be something else. And again, this is why this is so prejudicial, because once you accept that the claim requires ionic bonding, all the other references except Gibbons aren't a problem. Gibbons, because of the construction that Smith argued and the board adopted, it looked at Gibbons, which gives, example 25, which gives 15 samples. Two of them are controls. They stay white. Every other example turns purplish when dry, and Gibbons itself describes that as discolored. That's why Judge Sneddon below dissented. He says there's no way that could possibly be the right construction. Judge Sneddon, unfortunately... The board went on and said that purplish could fit within the understanding of a claim construction for photostable, right? Not if it results in discoloration. I mean, I think... Because that's the whole point of... This is A40, that the material may undergo a controlled color change to a desired color with some minimal discoloration, even to an undesirable color from the desired color, and even some degree beyond a minimal discoloration, and still be considered substantially photostable. And then he goes on to say, even if purple were shown to be an undesirable color, Gibbons 751 reports a change to purplish, or having purple specs. Such a description indicates only a substantially minimal color change to purple. That is encompassed by the broad language recited in the claims, and the broad definition for photostable. Again, it's ignoring the fact that photostable is first mentioned in the spec in the context of being the cure. Art recognized cure for discoloration. So if the board adopts a definition of photostable that permits discoloration, that's unreasonable. But it says minimal change thereafter. Why doesn't that encompass minimal discoloration thereafter? Well, discoloration it can't include. A color change to something would be okay. But again, the context of this is medical devices. If you pull a medical device out of the package, and it has specs on it, or stains or blotches, that's going to be interpreted by the induced as a clinician, or worse yet, the patient, as a sign of defect, or contamination, or tampering. So the whole point of this invention is to avoid discoloration. And in fact, that's the problem with Judge Sneddon's concurrence. Not only does he create a new ground of rejection, but in doing so, he says it's no apparent discoloration. But in fact, if you look at the examples that are cited, you control the domain of white. One of the samples turns purple, and the other one is purple and has specs. The problem with that is not that it's purple. The problem is that it has specs. He says specs are a minimal problem. But in this context, specs are exactly what you want to avoid, because that's precisely the discoloration that's going to suggest to the individual. So then what does minimal change thereafter mean to you? It says change to a desired color, and then minimal change thereafter. Is it a minimal change to yet a different desired color? Yeah, that could be fine. But is that all it can encompass? It can't encompass minimal undesired change? It cannot discolor. That is the thing that it can't do. It cannot discolor to the point that an end user would recognize that as a problem, or at least assume that it's going to be a problem. And here the board seemed to find that a purplish tinge fits within the claim language. And in fact, only two of the judges even did that, because it really is unreasonable in light of the specification. I'm into my rebuttal time. I would like to briefly touch on the fact that, yes, we understand the court decided to close it. Yes, we understand the court said that Chevron deference applies to the board's administration in these proceedings. We've never contested that proposition. We do question whether Chevron has been followed appropriately here. There's a three-part test to Chevron. One is, are they administering the system? Are they filling a gap, and have they done so reasonably? We believe that there are problems in all aspects of that. Specifically, unlike in Chevron where the EPA went through an extensive record building to develop an independent standard, the board didn't do that. I'm sorry, which rule are we talking about? Which rule are you targeting right now? Well, okay, there are two, but I'm talking initially about adoption of the broadest reasonable interpretation, and then we'll also talk about the gaps. I mean, closeover is always the broadest reasonable interpretation issue. Right. I mean, you're going to have to argue with us if you want us to review that. No, no, Your Honor, you're missing the point. We embrace the broadest reasonable interpretation. Oh, you're just saying they have applied it incorrectly. They have applied it seriously incorrectly here, because it's not their standard. They didn't do the work to make the standard. They simply adopted this court standard. So how do you interpret that standard? They are entitled to no deference. Rather, the question is how faithful are they to that standard? So if the board said, in addition, that what was reasonable was judged from the perspective of an APJ at the time of the decision, this court would have no problem saying, no, no, no, that's wrong. It's the perspective of one ordinary skill in the art at the time of filing. Similarly, in this case, the court's case law makes it very clear that there's got to be a fair chance to amend the claims. In Cuozo, it says that the court didn't see a difference. But on the facts in Cuozo, that was a broadening amendment. So there was no difference from post-grant practice elsewhere. On the facts of this case, there is a problem, because it's a narrowing amendment. The board has adopted, to our prejudice on the facts of this case, the requirement that we prove patentability. That's flat and contradictory to 316E. There is no gap to fill there. Didn't we say in Proxicon that the burden's on the patent owner? Yes, but Proxicon doesn't address the plain language of 316E, Your Honor. The board can't fill a gap where no gap exists. Congress filled that gap. The board has no discretion to fill it. All right, let's hear from the other side. All right, the time is being split. Mr. Lenny, you're taking ten minutes, and then Ms. Lateef is taking five. That's correct. Okay, go ahead. Thank you, ma'am. Please support Brad Lenny for the Appellee Smith and Nephew. The board correctly decided all the key issues in this case, and the board's decisions in these two IPR proceedings should be affirmed in their entirety. I'd first like to key off some of the discussion regarding Conditec's arguments with respect to the incorporation term. So, Your Honor, we're focused on the example of unmodified polysaccharides being incapable of undergoing on-exchange between the polymer and the silver. That's also true with respect to polyurethane, and that's another point that's not contested by Conditec. But in addition to the claims themselves being able to select from that class of polymers, the specification also states very clearly that the same list of polymers are suitable for the invention. So they've got to square that idea that they've described in the specification, two examples of polymers that are incapable of undergoing on-exchange, as being suitable for the invention. And the idea that the specification equates the term loading and incorporation is just completely unsupported. If you look at what the specification does, it specifically defines one term, loading, to require on-exchange, but the other term, incorporation, isn't disclosed at all. But then the patent also talks about loading just above the definition for loading and talks about it in the same way that the patent earlier talks about incorporating. That is to say that when you do the steps a certain way, then the silver gets incorporated or the silver loads into the polymer. And that's not inconsistent with some of the polymers that are described, but importantly, that loading is only going to happen where you have polymers that have ion exchange units to permit ionic bonding. Now, on photostability, I think Counsel for Compitech just admitted that a change from white to purple would be acceptable. That's completely contrary to their expert extrinsic evidence that said purple is an undesirable color. So I think I just heard them completely backtrack from their expert that put in a declaration that said the only acceptable colors, as far as the desired color, are white and whitish-gray, and that purple is definitely not an acceptable color. So that's an interesting change of tact on their part, factually. A couple other things on the definition of photostable. The definition allows for controlled color change to a desired color. And that clearly allows for discoloration. So while Compitech tries to describe the invention as be solving a discoloration problem, they specifically define photostable to allow for discoloration. Now that's not our problem. The fact that they coined the term photostable extremely broadly in a way that is very much at odds with the normal definition of photostable is something that they've got to live with. When they wrote these claims, if they wanted to have a material that was sensitive to light stability, they didn't have to use the word photostable because it incorporated such a broad term. They could have said that the resulting material doesn't discolor when exposed to light. That would have been a different way to claim what they're now trying to do. But the whole context of the patent, the whole contribution to the art is to neutralize discoloration. Well, not necessarily. So it's twofold. It deals with making it more photostable, but also antimicrobial. So there may be some tension there. Antimicrobial was already part of the prior art. The problem was these antimicrobial agents would discolor in use. And so the invention was designed to figure out a way to neutralize the discoloration. I don't dispute that one of the problems that the patent is seeking to solve is discoloration. However, they coined the phrase photostable extremely broadly, and that's something that is a public notice function to the public at large and is entitled to rely on that definition. So I don't think you can rewrite the express definition they've provided in the specification to allow for discoloration. So where in the definition of photostable do you take it that it encompasses some discoloration? So it's in the first stop where you have controlled color change to a desired color. How could that possibly be discoloration? How could desired color be discoloration? I agree. That wouldn't be discoloration. Okay. So then where's the discoloration in the definition for photostable? It's after you have that controlled color change to a desired color. If there's more than minimal color change thereafter, that would be discoloration. So you can go from white to purple, and then if upon further exposure to white, after you open the package, for example, it went to a further dark purple or a different color, red or blue or black, that would be further, more than minimal discoloration, and then that would not be a photostable. Let me see if I get this straight. It could be white at first. Yes. It gets exposed to light somehow, and then maybe goes to some light purple. Yes. But then thereafter, it moves to deep purple. Correct. That would not be photostable. That would not be photostable. Correct. But if it went to light purple and stayed at light purple, that would be okay? That's right. And again, that's just what Gibbons did. So if you look at the Gibbons example, Gibbons is working with a white wound dressing. It exposes it to the silverization process and then exposes it to light, and this is Gibbons doing the experiment, so this is akin to the manufacturer, intentionally exposing it to light, and it turns purple. If you then package it and you open up the package and it stays purple or just has minimal color change, that's a photostable material. If, on the other hand, Gibbons exposes it to light intentionally, it goes to purple, you package it, open up the package, and it turns black or it turns dark purple. It wouldn't be photostable. But the evidence on Gibbons is that the change from white to purplish or the change from white to purple specks is not appreciably discoloring in light. I mean, he said that Gibbons recognized that it was discolored, but if you look at the Gibbons reference, and this is in example 24, so there's example 24 and example 25. They both report color change from white to purplish, and in example 24 he says those samples, all these samples, did not appreciably discolor in light. So that's Gibbons expressly stating that the change from white to purple is not appreciably discoloring. Or white to purplish. Or white to purplish. Or white to purple specks. That's right. Briefly, I'd like to go on to the motion to amend. ComTech challenges the board's denial of its motion to amend, but from this court's recent decision on Microsoft v. ProxyCon, the one thing that this court stated that, at a minimum, a patent owner needs to do to prevail on a motion to amend in an IPR proceeding is demonstrate how the amendments overcome the priority of record. Now, the board found that there were a number of reasons that the motion to amend was deficient, but significantly the board found that the amendments failed to overcome the Gibbons reference. And that's very clear in the record that they failed to overcome the Gibbons reference. The three amendments that were made were adding that the polymer be a gel-forming fiber, it replaced incorporate with load, which would require ionic bonding, and then it deleted substantially from the term substantially photostable. Gibbons unquestionably discloses a gel-forming fiber. That's not in dispute. As far as loading, the only argument that ComTech had as to why Gibbons didn't result in ionic bonding and loading was because it claimed example 25M was in the reverse order. It said Gibbons exposed the polymer first to the salt agent and then to silver. The board squarely disagreed with ComTech on that factual issue that the board's decision that example 25 is in the correct order is supported by substantial evidence. And there's no dispute that if it's in the right order... 25M, right? 25M. Okay. M. And finally, the board held that because Gibbons is applying a substantial identical process to the exact same Aquacel commercial product that's described in the 9-1-A patent, that you'll necessarily inherently get a photostable material. And again, that's not something that ComTech challenges. I think ComTech seems to be challenging whether there should even be a burden placed on it in terms of being able to have its amendment motion granted, suggesting that the Proxicon opinion didn't address some kind of statutory question under Section 316. Yeah. My understanding is that the Proxicon decision resolved that issue and said it was entirely proper for the Patent Office to implement a statutory mandate and require to place the burden on ComTech to establish that its claims are patentable and it's entitled to its motion to amend. Real quickly, in addition to that, there's an additional prior art combination that they don't overcome with their amendment, and that's a combination of Creedle and Vahia. And that combination we explained in our opposition to the motion to amend, that it results in photostability, that's unquestioned. The only challenge to that combination by ComTech in its reply brief on the motion to amend was that you wouldn't properly combine it and there wasn't a sufficient motivation to combine the two references. Again, on that point, the Board agreed with us. The Board agreed with Smith and Nethew that there was sufficient evidence to have a motivation to combine the Creedle and Vahia references, and they did that in connection with some of the dependent original claims and that motivational finding is at A26. And for the reason that we stated in the brief, that combination also renders each of the amended claims unpatentable and is sufficient to be used. You're out of time. I'm sorry, Mr. Lenny.  Thank you, Your Honor. Thank you. Good morning. May it please the Court, Monica Lateef on behalf of the United States Patent and Trademark Office, and I'm here to talk about the one procedural aspect of the Board's decision, which is the motion to amend. I agree with Smith and Nethew's counsel that this case falls squarely within the Microsoft v. Proxicon decision, and to the extent that there is a question about the burden in proving the motion to amend, I think that that precedential case answered that question. Did that case address Section 316 of the Patent Act, which seems to suggest that the burden is on the petitioner? Well, the case talks about the fact that because it's the patent owner who's moving for the motion, that the burden falls on the movement. However, to the extent there's concern about Section 316, that section is talking about an issued patent and claims within an issued patent, looking at, as it says, proving a proposition of unpatentability. In the motion to amend, you have proposed claims. You're not looking at a proposition of unpatentability. What you're trying to do is basically prove that you can have these claims in a patent. So the statute that would be applicable to the proposed amended claims would be 3116A9, where you're basically saying that the director can prescribe regulations that import the standards and procedures. So 316E isn't really applicable to proposed amended claims. They're not actual claims. So as far as work, under the office's position, is basically that this case is just like Microsoft v. Proxycon. Here, Convitex failed to demonstrate that its claims are patentable over the prior record, which was Gibbons, and Gibbons was a part of the IPR from the very beginning. Beyond that, any other explanations that the court made about the motion to amend were just alternative reasons why it was deficient. The court doesn't have to reach those, but to the extent the court has questions about those, I'm happy to answer them. Yeah, the board seems to have a practice. In terms of motions to amend, it has a rule that patent owners have to show written description support in the original filed patent application and can't just rely on the actual patent that was granted. And here, the patent owner relied on the patent granted, which is identical to the original filing. Doesn't it seem kind of ticky-tack to reject an amendment for that hyper-technical reason? Respectfully, I would disagree, Your Honor. It's part of our regulations. It's in the regulation? I'm sorry? This rule is in the regulation that you have to go all the way back to the actual specification you filed at PDO? Yes, Your Honor. It's in 37 CFR 42.121. It says that a motion to amend must include a claim listing showing the claim changes clearly and set forth the support in the original disclosure of the patent for each claim that is added or amended. So it's required that you show it in the original disclosure. Whether or not the original disclosure and the issued patent have the same specification, we have no way of knowing that. The Calvin Tech didn't say that they did. They just pointed to the patent, and our rules require that you point to the original disclosure. So we are basically holding them to our rules. I don't think that's sort of a technical error on their part. Can you explain what did this recent board order called Master Image do with respect to EIDL3 and this practice of what are the demands and expectations on patent owners when it comes to motions to amend? Sure, I'm happy to do that, Your Honor. I just want to reiterate that this case, I think you don't necessarily need to turn on that section, but I'm happy to answer the question, which is basically under our regulation. Well, let's ask it differently then. Are you saying that now that the board has apparently adjusted its practice, we shouldn't consider this particular ground for rejecting the amendments here? No, and I apologize if that's sort of how you interpreted my answer. What I'm saying is in this particular case, Calvin Tech failed to meet the bare minimum, which is demonstrating patentability over the prior art of record. So in this particular case, you can decide on that alone. But to answer your question about the board requiring that people, the patent owners, to demonstrate patentability over prior art of record and prior art known to the patent owner, I'm happy to answer that, and I will. I just wanted to make it clear that that's not dispositive here. But to answer you, so under our regulations, we require that patent owners prove patentability over the prior art of record as well as prior art known to the patent owner. There's a duty of disclosure in our regulations, which is 37 CFR 42.11,  you also let us know what is known to you, and we use EIDL3 and Master Image 3D to basically explain what we mean by that. It's always been in our regulations. It's not changing the regulations. It's just helping the public sort of understand what it is we're looking for. And if you look at Master Image, it sort of breaks down what they mean by prior art of record, and it talks about any prior art material in the prosecution history as well as in the IPR proceedings. Right. No. The more interesting part is the prior art that is not in the record somehow, but is somehow known to the patent owner. Sure. Well, if you have a duty of disclosure, you should always be submitting any prior art known to you. All right. Are you saying that PTO's position that there's no daylight between what the Master Image order says and what the EIDL3 order says? When you say daylight, am I suggesting that? Was there any kind of adjustment? Was there a change in practice? It's not a change in practice as much as the explanation. There was obviously confusion among the public. People weren't sure what EIDL3 was saying. Yeah, that's because this board decision seemed to say that this patent owner needed to come forward and explain all the prior art it knew and why that prior art that it knew did not render this amended claim unpatentable. And now the Master Image order seems to be not requiring that. Well, I disagree. I think the Master Image order explains that you still always have your duty of candor. So basically it's weighing out what prior art of record means, making it clear, and then it's saying, keep in mind your duty of candor always remains. 37 CFR 42.11 has always been there. You're always required, to the extent you find something, to supplement the record with it. Or when you're doing your motion to amend, you can share it then. But it hasn't changed anything. It's always been there. It's always been a requirement. Okay. Thank you, Ms. McKee. Mr. Twerkson, we'll give you 2 minutes. 2 minutes of rebuttal. There's a lot to discuss, then, Your Honor. I'd like to start off by talking about who has the burden on patentability. The statute is very clear. It doesn't say original claims. It doesn't say except when there's an amendment. But what I thought was really telling my friend's argument is she says, proposed claims don't have a burden of patentability. But then she tells us the rules themselves impose a burden of patentability. Either the patent owner is facing a burden of patentability, or it's not. The board said we were, and we failed to carry it. We're pointing out that the statute doesn't allow the board to do that. If at the end of the analysis, when it's looked at the opposition and everything else, it decides the claims are unpatentable, that's fine. I guess maybe their point of view is the claim is not really a claim yet, in the same way that the term claim is used in Section 316, which is referring to issued patent claims. And now these are stand-in, proposed claims. Two mistakes with that line of reasoning, Your Honor. First of all, the statute doesn't make that distinction. It says, in an inter-parties review, a petitioner has the burden of proving a proposition of the unpatentability. So any proposition of unpatentability. So is it the patent board's responsibility, then, to go do a prior art search once someone files an amendment? The board certainly has the discretion to do it. And in fact, that's, well, they didn't make this argument. I'm just trying to understand, as a practical matter, how does it work? As a practical matter, there are several. You can amend the claim. Now the claim is a different claim. And the board, if it doesn't do an examination, then the claim could just go out the door unexamined? Well, one, that doesn't happen because the board, in fact, does examine. There are at least two instances of examination. In this case, in Cuozzo, the board entered a new ground of rejection. And the court, at the solicitor's suggestion, accepted that the board can do examination. So it does have the discretion to do examination. Whether it should in every case, of course, it's up to the board's discretion. But Congress recognized this problem. So there are two guarantors. One is the claims can only be narrower. So even if they issue a still unpatentable over some unknown prior art, they're less unpatentable than they were before. So the public is better off. Remember when the PTO says we have to consider efficiency in making our rules? They also are supposed to consider the effect on the economy and the integrity of the patent system. An amendment process makes the claims better. They may not be perfect, but they're better than they were. That promotes the economy. That promotes the integrity. Sorry, over your time, do you have a last point, a final point? Congress itself allows the board to consider the claim amendments, even if the petitioner settles out of the case. And they did that in the international fragrances case without opposition. So clearly the board can examine if it wants to or not examine if it wants to. Congress knew what it was doing. OK, thank you. The case is submitted.